IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION


WILLIAM JOHNS                                              PLAINTIFF


v.                            NO. 3:19-cv-00354 PSH


ANDREW SAUL, Commissioner of                         DEFENDANT
the Social Security Administration


## MEMORANDUM OPINION AND ORDER


In this case, plaintiff William Johns ("Johns") maintains that the findings of an Administrative Law Judge ("ALJ") are not supported by substantial evidence on the record as a whole.[1] Johns so maintains because the record does not contain an opinion from a treating or examining physician commenting on Johns' specific work-related limitations, leaving the ALJ to draw his own inferences about Johns' work-related limitations.

---

[1] The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support the [ALJ's] conclusion." See Id. "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." See Lucus v. Saul, 960 F.3d 1066, 1068 (8th Cir. June 3, 2020) [quoting Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted)].

Johns was forty-two years old on August 1, 2015, i.e., the day he allegedly became disabled. He alleged in his applications for disability insurance benefits and supplemental security income payments that he is disabled as a result of impairments that include heart problems.

The record reflects that Johns has a history of heart problems dating back to at least 2008. That year, he suffered a myocardial infarction which required the placement of two stents. See Transcript at 467-507.[2]

On August 11, 2015, Johns presented to the White County Medical Center complaining of chest pain. See Transcript at 567-582. His social history was compiled, and it reflects that he was smoking a pack of cigarettes a day and had been doing so for twenty-seven years. The results of an echocardiogram showed mild concentric left ventricular hypertrophy. His estimated left ventricle ejection fraction was between fifty and sixty.[3] The results of a cardiac catheterization revealed a blocked stent, and the

---

[2]     Johns represents that he suffered a second myocardial infarction in 2011 which required the placement of two stents. See Docket Entry 11 at CM/ECF 4. The medical evidence he cites, though, is from his 2008 myocardial infarction. See Transcript at 467-507. His testimony was that he suffered a "heart attack" in 2008 which required the placement of two stents but did not have "more done" until 2015. See Transcript at 39.

[3]     The ALJ found, and the Court agrees, that the "ejection fraction ... is the percentage of the blood emptied from the ventricle during systole; the left ventricular ejection averages 60% to 70% in healthy hearts but can be markedly reduced if part of the heart muscle dies (e.g., after myocardial infarction) or in cardiomyopathy or valvular heart disease." See Transcript at 16, n.1.

stent was replaced. Johns was diagnosed with impairments that included unstable angina, coronary artery disease, and anteroseptal infarct. He was also diagnosed with hypertension, which was deemed to be stable. He was continued on medications that included nitroglycerin and carvedilol, was placed on Brilinta and aspirin, and instructed to transition to Plavix after thirty days. He was also instructed to take lisinopril instead of verapamil and atorvastatin instead of pravastatin.

On September 18, 2015, Johns was seen for a follow-up examination by Dr. Katherine Durham, M.D., ("Durham"). See Transcript at 562-564. The progress note reflects that his history of present illness was recorded to be as follows:

> This is a 42-year-old man here today for a follow-up. He says that he continues to have chest pain and he says that this is usually relieved with one nitro and rest. He says he overall does not feel well and has fatigue. He also has dyspnea with exertion. He said, in the past when he had stents to the [left anterior descending artery], he felt a lot better, but at this time he is not. He does admit that he feels some better than when in the hospital, but has not regained his full capacity to daily activities. He is very concerned about this. He is taking his medications as prescribed and denies missing any doses of Brilinta and is now transition[ing] to Plavix after the first 30 days. He continues to smoke, but say that he is trying to cut back. He is concerned because he feels agitated.

See Transcript at 562. Durham's diagnoses included coronary artery disease and ongoing exertional angina. She ordered a myocardial perfusion study, the results of which revealed a fixed defect in the septal wall of his heart consistent with a previous myocardial infarction, no evidence of ischemia, and a left ventricular ejection fraction of sixty-one percent. See Transcript at 565-566.

Johns saw Durham again on December 15, 2015. See Transcript at 629-631. The progress note reflects that Johns had no pain with exertion but had pain about twice a week in a pattern that had not changed since his last evaluation. He continued to smoke cigarettes and was not exercising regularly. He had normal muscle strength and tone and no gross motor deficits. His hypertension was well-controlled. Durham continued Johns on medication.

Johns did not see Durham again until April 18, 2016. See Transcript at 632-634. At the presentation, Johns reported that he continued to have intermittent chest pain made worse with stress, continued to tire easily, and occasionally had dyspnea on exertion. His hypertension was controlled, but he continued to smoke cigarettes on a regular basis. Durham continued Johns on medication that included nitroglycerin, carvedilol,  and losartan. She also counseled him to stop smoking cigarettes.

On June 20, 2016, Johns was admitted to St. Bernards Medical Center for chest pain consistent with acute coronary syndrome and unstable angina. <u>See</u> Transcript at 664-672. A heart catheterization revealed single vessel coronary artery disease of the left anterior descending artery with significant fractional flow reserve. Testing also revealed a left ventricular ejection fraction of between sixty and sixty-five percent. Dr. Ziad Awar, M.D., ("Awar") performed what he characterized as a successful percutaneous coronary intervention with a drug-eluting stent and a percutaneous transluminal coronary angioplasty to the mid segment of the left anterior descending artery. Johns was discharged on June 22, 2016. The discharge note reflects that he was instructed to avoid heavy lifting for two to three days but should begin regular exercise on a limited basis. He could return to work in approximately ten days. The note additionally reflects that he was strongly encouraged to stop smoking cigarettes as it is a leading cause of heart disease.

Johns was thereafter seen by Sara Wilcox, an Advanced Practice Registered Nurse ("APRN"), for complaints that included a hematoma, lack of sleep, and depression. <u>See</u> Transcript at 689-691 (07/14/2016), 688-689 (08/29/2016). The progress notes reflects that Johns was feeling tired and depressed, but he continued to work full-time and be an everyday smoker.

Johns saw Awar's assistant on August 15, 2016. <u>See</u> Transcript at 675-678. Johns reported continued chest pain made worse with exertion. He also reported dizziness when standing too fast, no energy, sleeplessness, daytime fatigue, and headaches. His hypertension was well controlled. His medication was adjusted, and Provachol and CoQ10 were also prescribed.

On September 1, 2016, Wilcox completed a Medical Source Statement on Johns' behalf. <u>See</u> Transcript at 637-639. She opined that he can lift and carry a maximum of twenty pounds occasionally and ten pounds frequently. He can stand and walk for a maximum of about two hours but can only do so for ten minutes at a time. He can sit without limitation but can only do so for one hour at a time. Additionally, he must elevate his feet, requires frequent and longer than normal breaks, and must have the opportunity to shift at will from standing/walking or sitting. Wilcox estimated that Johns must miss work more than three days a month. When asked to provide the objective medical evidence to support her opinions, she represented the following: "Patient is positive for dyspnea on exertion and has dizziness. Does have chronic stable angina which results in not being able to work for long periods at a time." <u>See</u> Transcript at 638. She represented that the time period covered by her opinions is from "September [of] 2015 to current." <u>See</u> Transcript at 638.

Johns thereafter saw Wilcox and other professionals at ARCare on multiple occasions. See Transcript at 684-685 (09/29/2016), 681-683 (12/19/2016), 680-681 (04/07/2017), 863 (08/23/2017), 861-863 (09/26/2017), 861 (11/01/2017), 858-861 (11/07/2017), 858 (03/02/2018), 856-858 (03/07/2018), 856 (03/08/2018), 856 (04/13/2018), 854-856 (06/11/2018), 853-854 (06/21/2018). The progress notes reflect that Johns continued to complain of chest and neck pain. He continued to smoke cigarettes, though. He was continued on medication and encouraged to exercise.

Johns also continued to see Awar. See Transcript at 763-768 (08/22/2017), 744-762 (09/19/2017-09/20/2017), 735-743 (10/06/2017), 725-734 (12/05/2017), 715-724 (01/04/2018). At the presentations, Johns consistently complained of pain and tightening in his chest and shortness of breath. He reported that the pain grew worse with exertion but improved with nitroglycerin and rest. His hypertension was adequately controlled, but he continued to smoke cigarettes. His left ventricular ejection fraction was typically between fifty-five and sixty-five percent. During the period, Johns underwent a heart catheterization and received what appears to have been multiple stent replacements. He was continued on medication and encouraged to exercise.

Johns was seen at the White County Medical Center and/or Searcy Medical Center in 2017 and 2018 for complaints that included back and knee pain. See Transcript at 701-713 (06/07/2017), 695-697 (06/08/2017), 835-838 (08/03/2017), 830-834 (05/24/2018). The progress notes reflect that he had a limited range of motion in his cervical spine and had pain with rotation and extension. He was diagnosed with intervertebral cervical disc disorder with radiculopathy. Medication and injections were prescribed. The progress notes also reflect that Johns had mild edema in his right knee, an antalgic gait, and appreciable effusion. X-rays revealed degenerative changes to his patellofemoral joint and chondrocalcinosis of the medial and lateral compartments. Osteoarthritis and arthralgia were among the diagnoses. His knee was aspirated on at least two occasions, he received injections, and a knee brace was prescribed.

On December 11, 2017, Johns was seen by Dr. Joshua Morrison, M.D., ("Morrison") for complaints that included chest pain, shortness of breath, and fatigue. See Transcript at 793-796. The progress note reflects that a prior CT scan had been abnormal, showing a cystic-appearing structure in the left hilar region of Johns' chest. A pulmonary function test revealed moderate restrictions. Morrison diagnosed, inter alia, lung disease and recommended medication and additional testing.

Johns was seen at the White County Medical Center Cardiology Clinic by Dr. Bradley Hughes, M.D., ("Hughes") on at least two occasions in 2018. See Transcript at 810-812 (03/05/2018), 816-818 (04/04/2018). At the first presentation, the results of an electrocardiogram revealed no evidence of ischemia. Johns was continued on medication and a stress test was scheduled. At the second presentation, his history of present illness was recorded to be as follows:

> Mr. Johns is a 45-year-old gentleman with chronic angina as well as known coronary artery disease status post multiple [percutaneous coronary intervention or coronary angioplasty]. He states he has either six or seven stents. He smokes a pack per day and has done so for approximately 30 years. He states that he underwent a cardiac catheterization in January of this year by his cardiologist in Jonesboro, and he was told at that time that he did not need any more stents and that one of his arteries was too small to have any additional stents placed. He underwent a Cardiolite stress test since he was last seen here due to some complaints of chest discomfort and that study showed mild-to-moderate distal anterior and anteroapical reversible defect. He returns to clinic for follow-up of that test today. He states he does continue to have some occasional chest discomfort. When he has the chest discomfort, he just has to sit down and rest and wait for it to resolve. He does remain compliant with his medication list as listed.

See Transcript at 816. Hughes increased Johns' use of isosorbide, which he was then taking along with aspirin, atorvastatin, Cartia, carvedilol, Effient, Nitrostat, pantoprazole, and Ranexa.

On May 9, 2018, Johns was seen for a cardiac evaluation by Dr. Daniel Sherbert, M.D., ("Sherbert"). See Transcript at 847-849. At the presentation, Johns complained of chest pain on exertion, fatigue, dyspnea, and leg discomfort with walking. Upon physical examination, he had a regular heart rate and rhythm. An electrocardiogram was performed, and the results were abnormal. Sherbert diagnosed coronary artery disease, smoker, and chest pain; continued Johns on his medication; and prescribed a nicotine patch to aid in smoking cessation.

Johns appears to have seen Sherbert on two subsequent occasions. See Transcript at 844-846 (06/13/2018), 865-867 (11/21/2018). Johns reported chest spasms, shortness of breath with exertion, and dizziness but had a regular heart rate and rhythm. The results of an electrocardiogram were again abnormal. Johns reported that he had stopped taking atorvastatin due to cramping in his arms. Sherbert continued Johns on medication that included isosorbide and Ranexa, although simvastatin was added to his medication list.

Johns' medical records were reviewed by state agency medical experts. See Transcript at 80-92, 93-105, 107-123. The medical experts were of the opinion that Johns is capable of performing unskilled, light work.

Johns completed a series of documents in connection with his applications. <u>See</u> Transcript at 332-339, 340-341, 358-359, 360-367. In the documents, he represented, <u>inter alia</u>, that he can attend to his own personal care, perform light house work, shop, manage money, drive an automobile, occasionally hunt and fish, and spend time with others. He estimated that he can stand/walk for ten to twenty minutes before he experiences pain and can sit for one hour before experiencing pain.

The record contains more than one summary of Johns' earnings history. <u>See</u> Transcript at 277-293. Taken together, they reflect that he has had minimal earnings during his adult life.

Johns testified during the administrative hearing. <u>See</u> Transcript at 54-72. He is approximately five feet, eight inches tall and weighs 210 pounds. He has a fourteen-year-old son and helps care for him. Johns lives by himself in a trailer owned by his father. His father pays the utilities, cooks Johns' meals, buys him cigarettes, permits him use of an automobile, and pays his fuel costs. Johns' impairments cause, <u>inter alia</u>, chest pains, shortness of breath, and fatigue. He experiences pain in his neck, shoulder, and ankle. He continues to smoke cigarettes but has cut back to half a pack a day. He can lift no more than forty pounds at a time and can sit for about thirty to forty-five minutes before having to elevate his legs.

The ALJ found at step two of the sequential evaluation process that Johns has severe impairments in the form of osteoarthritis, coronary artery disease, hypertension, obesity, depression, anxiety, and chronic obstructive pulmonary disorder. The ALJ assessed Johns' residual functional capacity and found that he is capable of performing sedentary work with some additional limitations.[4] As a part of so finding, the ALJ discounted Wilcox's medical opinions contained in the Medical Source Statement because she is not an acceptable medical source, her opinions lack an objective basis, and they are inconsistent with the record. The ALJ also discounted the medical opinions of the state agency medical experts, finding that Johns has greater limitations than they opined. The ALJ found at step four that Johns has no past relevant work. At step five, the ALJ found that a hypothetical individual with Johns' limitations could work as a document preparer or surveillance monitor. Given those findings, the ALJ concluded that Johns was not under a disability as defined by Social Security Act.

---

[4]     As to the additional limitations, the ALJ found that Johns can only occasionally climb, stoop, crouch, kneel, and crawl and must avoid any exposure to temperature extremes, chemicals, dust, fumes, humidity, unprotected heights, work on ladders and scaffolds, and commercial driving. The ALJ also found that Johns is able to perform "simple unskilled or semi-skilled activity; understand, follow, and remember concrete instructions; and has no contact restrictions with supervisors, co-workers, or the public." See Transcript at 14.

Johns maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole. Johns so maintains because the record does not contain an opinion from a treating or examining physician commenting on Johns' specific work-related limitations, leaving the ALJ to draw his own inferences about Johns' work-related limitations. Johns notes that "[t]his especially is problematic here, where Johns suffers from a complicated heart condition requiring multiple stents, thus requiring the ALJ to read, interpret, and draw medical conclusions from Johns' voluminous and complex medical treatment records from several cardiac specialists." See Docket Entry 11 at CM/ECF 15-16.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most a person can do despite his limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). There is no requirement, though, the assessment be supported by a specific medical opinion. See Hensley v. Colvin, 829 F.3d 926 (8th Cir. 2016). In the absence of opinion evidence, the medical records of the most relevant treating physicians can provide affirmative medical evidence supporting the ALJ's assessment. See Id.

The Court is satisfied that the ALJ adequately developed the record, and there is sufficient information for him to have made an informed decision. It is true that there is no opinion from a treating or examining physician commenting on Johns' specific work-related limitations. Such an opinion was not required in this instance, though, as the ALJ could and did assess Johns' residual functional capacity on the basis of the evidence in the record. The Court so finds for the following reasons.

First, the ALJ's assessment of Johns' residual functional capacity is not inconsistent with the evidence relevant to his mental impairments, and opinion evidence as to the work-related limitations caused by the impairments was not necessary. Although Johns was diagnosed with depression and anxiety and prescribed medication, depression screenings were either negative, see Transcript at 681, 686, or revealed only mild to moderate symptoms, see Transcript at 689.[5] He was advised of treatment options but does not appear to have taken advantage of them. The record also reflects that he can do such things as shop, manage his money, spend time with others, and help care for his child.

---

[5]     The findings appear to have been made by Wilcox and another APRN. Although an APRN is not an acceptable medical source for purposes of the Social Security Act, an APRN can provide information to help understand a claimant's impairments. See Sloan v. Astrue, 499 F.3d 883 (8th Cir. 2007).

Second, the ALJ's assessment of Johns' residual functional capacity is not inconsistent with the evidence relevant to his neck and back pain, and opinion evidence as to the work-related limitations caused by the impairments was not necessary. MRI testing of Johns' cervical spine in January of 2016 showed minimal disc desiccation at the C5-C6 level but no significant disc bulge, disc protrusion, canal stenosis, or foraminal narrowing. See Transcript at 613. The subsequent physical examinations of his cervical spine were largely unremarkable, save the observations of a Physician's Assistant ("PA") in August of 2017. At that presentation, the PA observed that Johns had "minimal tenderness on palpation," a limited range of motion, and pain with rotation and extension in his cervical spine. See Transcript at 837. The PA prescribed medication and considered referring Johns for an epidural injection. It is not clear how long Johns used the medication, and it does not appear that he ever received the injection. In any event, Johns was thereafter seen by several medical professionals, and none of them made findings consistent with the observations made by the PA. For instance, Johns was seen by Morrison in December of 2017, and a physical examination was largely unremarkable. See Transcript at 793-796. Moreover, the record reflects that Johns can do such things as perform light house work, occasionally hunt and fish, and help care for his child.

Third, the ALJ's assessment of Johns' residual functional capacity is not inconsistent with the evidence relevant to his knee pain, and opinion evidence as to the work-related limitations caused by the impairment was not necessary. X-rays of Johns' knee in June of 2017 revealed degenerative changes to his patellofemoral joint and chondrocalcinosis of the medial and lateral compartments. See Transcript at 697. His knee was aspirated on at least two occasions, he received injections, and a knee brace was prescribed. Although repeated physical examinations reflect that Johns had normal muscle strength and tone in his lower extremities, his knee pain undoubtedly impacted his ability to stand and walk. The ALJ appears to have taken the limitations caused by the impairment into account as he found that Johns was limited to a reduced range of sedentary work.

Fourth, the ALJ's assessment of Johns' residual functional capacity is not inconsistent with the evidence relevant to his ankle pain, and opinion evidence as to the work-related limitations caused by the impairment was not necessary. Johns testified that he underwent surgery in the early 1990s after tearing the ligaments in his right ankle. See Transcript at 59-60. There is little evidence that touches on the severity of the injury. In any event, the ALJ's finding that Johns is limited to a reduced range of sedentary work undoubtedly accounts for the limitations caused by the impairment.

Fifth, the ALJ's assessment of Johns' residual functional capacity is not inconsistent with the evidence relevant to his hypertension, and opinion evidence as to the work-related limitations caused by the impairment was not necessary. Although Johns has hypertension, it was routinely stable or otherwise adequately controlled with medication. <u>See</u> Transcript at 576, 631, 634, 677, 792. There is nothing to suggest that the impairment causes him any meaningful work-related limitations.

Sixth, the ALJ's assessment of Johns' residual functional capacity is not inconsistent with the evidence relevant to his obesity, and opinion evidence as to the work-related limitations caused by the impairment was not necessary. Although his Body Mass Index is approximately thirty-two, or within the obese range, there is nothing to suggest that his weight causes him any meaningful work-related limitations.

Last, the principal issue in this case is the extent to which Johns' heart problems impact his work-related abilities. He has suffered at least one myocardial infarction and has repeatedly sought medical attention for his heart problems. He has undergone several heart catheterizations; has had a number of stent placements; has consistently complained of chest pain, shortness of breath, and fatigue; and has been prescribed medication. The ALJ's assessment that Johns can nevertheless perform a

reduced range of sedentary work is not inconsistent, though, with the evidence relevant to his heart problems as the assessment appears to take into account the limitations caused by the impairment. Opinion evidence as to the work-related limitations caused by the impairment, while helpful, was not required because the medical records of his treating physicians are capable of more than one acceptable characterization and provide affirmative evidence supporting the assessment.

For instance, the medical records from Johns' August of 2015 presentation to the White County Medical Center reflect that he was smoking one pack of cigarettes a day and had been doing so for twenty-seven years. The results of an echocardiogram revealed that although he had concentric left ventricular hypertrophy, it was characterized as mild. It is true that a stent was replaced and medication prescribed, but it is telling that his left ventricular ejection fraction was estimated to be between fifty-fifty and sixty, or within the normal range, and no work-related limitations were imposed.

Durham's progress notes reflect that Johns had normal muscle strength and tone and no gross motor deficits. Johns continued to smoke cigarettes and had made no attempt to exercise on a regular basis. The results of a myocardial perfusion study revealed a fixed defect in the septal

wall of his heart consistent with a previous myocardial infarction, but there was no evidence of ischemia. His left ventricular ejection fraction was found to be within the normal range. She continued him on medication but imposed no work-related limitations.

The medical records from Johns' June of 2016 presentation to the St. Bernards Medical Center reflect that he had single vessel coronary artery disease of the left anterior descending artery with significant fractional flow reserve. Awar performed a successful percutaneous coronary intervention. When Johns was discharged, Awar instructed Johns to avoid heavy lifting for two to three days, but Johns could otherwise begin regular exercise on a limited basis and could return to work in approximately ten days. Awar's recommendations are inconsistent with Johns' allegation of disabling symptoms. Awar also encouraged Johns to stop smoking cigarettes, a recommendation Johns did not fully embrace.

Awar's subsequent progress notes reflect that Johns received multiple stent placements and/or replacements and continued to complain of chest pain and shortness of breath. Johns' left ventricular ejection fraction, though, was within the normal range. He was also encouraged to exercise and stop smoking cigarettes. Those recommendations are not consistent with his allegation of disabling symptoms.

Johns saw Wilcox on multiple occasions for complaints that included chest pain. In September of 2016, Wilcox completed a Medical Source Statement in which she opined as to Johns' work-related limitations. The ALJ discounted Wilcox's opinions because Wilcox is not an acceptable medical source, her opinions lack an objective basis, and they are inconsistent with the record. The ALJ could properly do so as his reasons are good reasons and are supported by substantial evidence on the record as a whole.

Morrison's progress note from December of 2017 reflects that Johns continued to complain of chest pain, shortness of breath, and fatigue, and had a prior abnormal CT scan. A pulmonary function test, though, revealed only moderate restrictions. Morrison continued Johns on medication but imposed no work-related limitations.

The progress notes compiled by Hughes and Sherbert are equally unremarkable. The notes reflect that the results of electrocardiograms revealed no evidence of ischemia but were otherwise deemed to be abnormal. Johns continued to smoke cigarettes and apparently made no effort to exercise. Although Hughes and Sherbert prescribed medication, they did not place limitations on Johns' ability to perform work-related activities.

The ALJ's construction of the medical records of Johns' treating physicians is also not inconsistent with the non-medical evidence in the record. Johns can attend to his own personal care, perform light house work, shop, manage money, drive an automobile, occasionally hunt and fish, spend time with others, and help care for his child.

It is for the foregoing reasons that the ALJ could properly assess Johns' residual functional capacity without the benefit of an opinion from a treating or examining physician commenting on Johns' specific work-related limitations. Substantial evidence on the record as a whole supports the assessment, and the fact that there is some medical evidence supporting Johns' position concerning the severity of his symptoms does not mean the ALJ's decision is not supported by substantial evidence on the record as a whole. See Adamczyk v. Saul, --- Fed.Appx. ---, 2020 WL 3957172 (8th Cir. 2020). Johns' complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 18th day of August, 2020.


_____

UNITED STATES MAGISTRATE JUDGE